FILED 4/15/2004 11:04:49 AM, USDC, Southern District of Iowa

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| ENTERTAINMENT TONITE L.C., d/b/a DAISY DOOKS, | * * * * | 3:03-cv-90078 |
| Plaintiff, | * * | |
| v. | * * | |
| THOMAS P. ROEMER, | * * | MEMORANDUM OPINION |
| Defendant. | * * | AND ORDER |

Plaintiff Entertainment Tonite L.C. d/b/a Daisy Dooks ("Entertainment Tonite") filed this action

on July 22, 2003, alleging that Defendant Thomas Roemer, a former member of Entertainment Tonite,

breached a covenant not to compete, made unauthorized use of Plaintiff's trade secrets, and breached

both a fiduciary duty and common law duty of loyalty to Plaintiff by disclosing its confidential financial

information.  Plaintiff initially sought preliminary injunctive relief to prevent Defendant from opening a

competing business establishment, which this Court denied.  Currently before the Court is Defendant's

Motion for Summary Judgment on all claims.  For the reasons detailed below, Defendant's motion is

**granted**.

I.  FACTS

In March of 1999, Defendant and three other people, Michael Speer, Mark McAfoos, and

Eric Long, entered into an agreement that formed the limited liability company Entertainment Tonite

L.C.  The members planned to open an adult entertainment establishment in the Davenport, Iowa area.

The operating agreement contained a section entitled "Non-Compete. Other Activities of Officers,"

which contained the following language:

> The Members hereby acknowledge that the Officers or Members are not allowed to compete with the adult entertainment business of the Company.  The Members agree that there shall be a 30 mile radius where this Non-Compete clause shall effect on all Officers and Members.  Because of the nature of the Company's business and the fact that no Officers are full-time employees of the Company, this is a life-time restriction.  The Officers and Members that choose to engage in such similar and competitive enterprises are restricted and have an obligation to account to the Company or to the Members for such activities.  Liquidated damages will be equal to the amount of net profit gained by the Member of [sic] Officer and the capital contribution to the competitive business and the amount of the initial capital contribution to the Company and the present amount of the Member's Capital account whichever is larger.  The Company to take such liquidated damages and divde them up proportionately to the Member's Membership Interests in the Company.  The consideration provided for this clause is the initial capital contribution provided by each Member or transferee Member.

Daisy Dooks opened for business in approximately October of 1999.  On or about November 20, 2000, Defendant sold his interest in Entertainment Tonite to John Pataska.  At some point after selling his shares to Mr. Pataska, Defendant began preparations to establish another adult entertainment business in the Davenport area.  During the summer or fall of 2001, Defendant began shopping a business plan around to prospective investors.  Defendant's business plan contained certain financial information from Daisy Dooks.  Specifically, Defendant stated in the plan that most of the financial assumptions set forth in the plan were drawn from Daisy Dooks' financial sheets.  Defendant also quoted figures regarding the cover charge revenue generated in the past year by Daisy Dooks, quoted the average number of customers Daisy Dooks was bringing in per night, disclosed that the total operating cost projections in the plan were based primarily on the past financial sheets of Daisy Dooks, and made cash flow projections based upon Daisy Dooks' financial statements.

In September of 2003, The Links Gentlemen's Club ("The Links"), an adult entertainment club,

opened at 643 East 59th Street in Davenport, Iowa, less than 30 miles from the Daisy Dooks location.

Defendant is a member and the operating manager of Status, L.L.C. ("Status"), which owns the

property located at 643 East 59th Street.  Status leases this property to Magic, L.L.C. ("Magic"), a

company wholly owned by Amy Miller, Defendant's wife, which owns and operates The Links at that

location.

II.  SUMMARY JUDGMENT

A.  The Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered

forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law."  An issue is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  A fact is material if the dispute over it might affect the outcome of the suit under

the governing law. *Id.*

The moving party has the burden of demonstrating the absence of a genuine issue of material

fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 248.  In

meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers

to interrogatories, and admissions. *See Celotex*, 477 U.S. at 323.  Once the moving party has carried

its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions,

answers to interrogatories, and admissions on file, designate the specific facts showing that there is a

genuine issue for trial. *See* Fed. R. Civ. P. 56(c), 56(e); *Celotex Corp.*, 477 U.S. at 322-323;

*Anderson*, 477 U.S. at 257.  The role of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 794 (1st Cir. 1992) (citations omitted).  In order to survive a motion for summary judgment, the nonmoving party must present enough evidence for a reasonable jury to return a verdict in his or her favor.  *Anderson*, 477 U.S. at 257.

On a motion for summary judgment, the Court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences."  *United States v. City of Columbia*, 914 F.2d 151, 153 (8th Cir. 1990).  The Court does not weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 252.  The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

B.  The Non-Compete Clause

Defendant argues that the non-compete clause is invalid for three primary reasons: 1) its terms apply only to current members and officers, not former members and officers; 2) its terms apply only to direct competition, not indirect competition; and 3) even if the clause did restrict former owners from competing, its terms are overly burdensome.

1.  Former versus Current Members or Officers

Defendant argues that the non-compete covenant contained in the Entertainment Tonite operating agreement was written to restrict competition only during the period of membership in the company and does not provide for any continuation of the restriction for former members or officers. As evidence of this, Defendant points out that all references in the covenant are to active members and

officers and that the liquidated damage provision refers to active members in that it references a member's current capital account with Entertainment Tonite as part of the liquidated damages calculation. Plaintiff argues that the use of the term "life-time restriction" argues against reading the language of the covenant only to include current members and officers, and that the drafter of the contract could have explicitly stated that the passage applied only to current members if that was the intent of the contracting parties. Plaintiff also relies on the Court's conclusion in its September 15, 2003 Order adopting Magistrate Judge Shields' Report and Recommendation that "a plain reading of the covenant does indicate that it is somewhat ambiguous, as Defendant has asserted." For this reason, Plaintiff argues that "[e]vidence must be taken to determine whether the terms 'officers or members' [were] used as terms of restriction or simply as terms of identification."

Beginning the analysis, the parol evidence rule "forbids the use of extrinsic evidence to vary, add to, or subtract from a (written) agreement." *Associated Grocers of Iowa Cooperative, Inc. v. West*, 297 N.W.2d 103, 109 (Iowa 1980) (quoting *Pappas v. Hauser*, 197 N.W.2d 607, 611 (Iowa 1972)). Extrinsic evidence is admissible to explain the "real meaning of the parties by the language used," or, stated another way, to explain "what was meant by what [the parties] said." *Id.* Extrinsic evidence is not admissible where it is proffered to add new conditions to a contract or to explain "what [the parties] meant to say." *Id.*

The Court finds that the terms "officers" and "members" in the non-compete covenant are ambiguous and that the introduction of extrinsic evidence is necessary to explain what the parties meant by the language they used. The Court has considered Defendant's arguments that the omission of any mention of former members or officers coupled with the reference in the calculation of liquidated

damages to a member's current capital account, which presumably a former member would no longer

possess, render the meaning of "officers" and "members" clear and unambiguous.  The inclusion of

language indicating that the restriction is to be a "life-time restriction," however, casts sufficient doubt on

the meaning of the terms "officers and members" to allow the introduction of extrinsic evidence to

clarify the meaning of those terms as they are used in the covenant.

Plaintiff has pointed to the Court to testimony of Michael Speer, one of the original members of

Entertainment Tonite, that indicates that all four of the original members of Entertainment Tonite actively

negotiated the terms of the non-compete agreement at the time they signed the original Operating

Agreement and that the members agreed that the clause should apply "for the remainder of the life - our

lives and the life of the company."  Additionally, John Pataska, the buyer of Defendant's share in

Entertainment Tonite, testified at the temporary restraining order hearing that the Defendant told Mr.

Pataska when he sold Mr. Pataska his shares that there was no need for a non-compete agreement in

the sale agreement between Mr. Pataska and Mr. Roemer because Mr. Roemer was already

prohibited from competing by the non-compete covenant present in the Operating Agreement.

Examining the evidence in the light most favorable to Plaintiff, the Court denies summary

judgment to Defendant on its theory that the language of the covenant applies only to former members

and officers.

2.  Direct versus Indirect Competition

Defendant has provided no legal support for its argument that the terms of the non-compete

clause apply only to direct competition.  From the limited argument Defendant has set forth on this

point, the Court infers that Defendant interprets his role in the operation of The Links as indirect

competition.  Defendant has failed, however, to provide any specific factual support for this assertion.

3.  Unreasonable Terms

Defendant's final argument, and the one that is dispositive in the Court's determination

regarding the non-compete covenant, is that even if the covenant is interpreted to contain a lifetime

restriction for former members, such a term is unreasonable.  Defendant argues that the approximately

two years that Defendant waited from the time he sold his interest in Entertainment Tonite until the time

he opened a competing establishment gave Plaintiff ample time to succeed in the adult entertainment

business, especially since Entertainment Tonite was already established with a customer base and a

base of dancers at the time Defendant sold his shares.  Plaintiff argues that Iowa law does not support

the finding that a lifetime non-compete clause incorporated in the organization documents of a new

entity is unreasonable, and asserts that the reasonableness of the non-compete clause in this case is an

issue for trial.

The Iowa Supreme Court, in *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 371-72

(Iowa 1971), reversed its previous position that restrictive covenants must be enforced as written or

not at all and adopted a rule which permits the total or partial enforcement of noncompete agreements

"to the extent reasonable under the circumstances."  The burden is on the party seeking to enforce the

covenant to show "'the reasonable necessity for the enforcement of the covenant at all in order to

protect its business.'" *Id.* at 373 (quoting *Mutual Loan Co. v. Pierce*, 65 N.W.2d 405, 408 (Iowa

1954); *see also Rasmussen Heating & Cooling, Inc. v. Idso*, 463 N.W.2d 703 (Iowa Ct. App.

1990) (a covenant not to compete in the sale of a business must be "reasonably necessary for the

protection of the business").  It has long been the rule in Iowa that one of the relevant inquiries in cases

involving business partners entering into non-compete agreements is whether the restraint provided for

affords a fair protection to the interests of the enforcer or whether it is out of proportion to the benefits

that can be reasonably expected to flow from the restrictive features of the covenant. *Haggin v. Derby*,

229 N.W.257, 259 (Iowa 1930).  A court's primary concern in assessing the reasonableness of a non-

compete covenant should not be to discourage fair competition, but to protect the party seeking to

enforce the covenant from being placed at an unfair disadvantage. *Ehlers*, 188 N.W.2d at 373.

In *Rasmussen*, the defendants, partial owners of a corporation that built and sold boat hoists,

sold their share of the business to the plaintiffs through an agreement which contained a covenant

prohibiting the defendants from engaging in a business "similar to" the one in which they were selling

their shares for a period of 10 years. 462 N.W.2d at 703-04.  The court found the covenant

unreasonable, holding that "a ten-year covenant is neither tightly time limited nor reasonably necessary

for the protection of the business." *Id.* at 705.  The court went on to find that the five years that had

elapsed between the sale and the initiation of a competing business "allowed the [plaintiffs] ample time

and opportunity to succeed.  Any further restrictions would be unduly burdensome." *Id.*

This Court initially notes that assessing the reasonableness of the covenant not to compete in

this case is complicated somewhat by the fact that it does not fall neatly into either one of the categories

that are most often addressed by courts: 1) covenants not to compete signed by employees at the start

of an employment relationship and designed to protect an employer after an employee leaves the

employment relationship, *see, e.g., Lamp v. American Prosthetics, Inc.*, 379 N.W.2d 909 (Iowa

1986); *Ehlers*, 188 N.W.2d 368; or 2) covenants not to compete entered into at the time of the sale or

dissolution of a business and designed to allow the new owner time to succeed in the business. *See,*

*e.g., Rasmussen*, 463 N.W.2d 703.  In this case, the members of Entertainment Tonite entered into a

hybrid non-compete covenant that Plaintiff alleges covers the duration of a member's involvement with

Entertainment Tonite and the period after which a member decides to sell his interest in Entertainment

Tonite.  For this reason, the covenant looks more like a general restraint on trade than a restriction that

is reasonably necessary for the protection of the business.

The language of the covenant itself professes that the lifetime restriction is desirable "[b]ecause

of the nature of the Company's business and the fact that no Officers are full-time employees of the

Company."  Plaintiff, however, has not presented any evidence that the nature of the adult entertainment

business is such that competition has a more detrimental impact on it than on other businesses.  Plaintiff

appears to argue that because the members of Entertainment Tonite did not rely exclusively on their

income from Entertainment Tonite for their livelihood, there was a greater potential for members to

dabble in other business ventures.  Framed that way, it seems Plaintiff was concerned with allowing the

business to succeed and allowing the members to realize a return on their investments without

competition from other members.

Although Defendant asserts that the relevant time period in which to assess reasonableness

begins on the date he sold his shares, the Court finds that the appropriate starting point is the date on

which the Operating Agreement containing the non-compete covenant was entered into by the parties.

To the extent the non-compete restriction was implemented to allow the business to succeed and to

allow the members to realize a return on their investments, the Court believes that any restriction

beyond the approximately four-and-a-half year time period between the signing of the Operating

Agreement and the opening of Defendant's competing club would be unduly burdensome.  Defendant's

return on his investment at the time he sold his shares demonstrates that a longer non-compete period

for Daisy Dooks would not have been reasonably necessary and would not have served any legitimate

business interest.  Defendant sold his shares in Entertainment Tonite for $300,000 a mere one-and-a-

half years after investing approximately $16,000 in the business.  Although a longer period of having

fewer competitors in the market might have created even more value for the initial investors, Plaintiff has

pointed to no specific evidence indicating that a longer restriction was reasonably necessary.

Consequently, Defendant's motion for summary judgment as to the breach of the non-compete

agreement is granted.

C.  Trade Secrets and Breach of Duty

Since similar facts underlie Plaintiff's trade secrets and breach of fiduciary duty and common

law duty of loyalty claims, the Court will discuss these facts together.  It is undisputed that at some point

after Defendant sold his membership in Entertainment Tonite in November of 2000, he began

preparations to open another adult entertainment establishment in the Davenport area.  As part of these

preparations, Defendant put together a business plan that included certain financial information

pertaining to Daisy Dooks.  Specifically, Defendant included: 1) figures indicating the revenue Daisy

Dooks generated from cover charge during the previous year; 2) the average number of customers

entering Daisy Dooks per night; 3) operating cost projections based primarily on the past financial

sheets of Daisy Dooks; and 4) "Cash Flow Projections" based at least in part on Daisy Dooks'

financial statements.[1]

---

[1]The Court's characterization of the information included in Defendant's business plan is based
upon testimony presented at the temporary restraining order hearing on August 21, 2003, attached to

It is also undisputed that the cover charge collected from patrons constitutes just under 80% of

the revenue of Daisy Dooks.  Plaintiff does not dispute Defendant's allegation that cover charge

revenues from the club can easily be calculated by counting the number of people who enter the

business, which is precisely what the members of Plaintiff Entertainment Tonite did at other clubs to

determine their potential for revenue before opening Daisy Dooks.   The fees collected from dancers

constitute approximately 15% of the revenues, and the club's financial arrangements with dancers are a

matter of public knowledge.  Additionally, according to the testimony of Defendant and of one of

Plaintiff's current members, Michael Speer, Plaintiff's tax returns and other financial information have

been shown in the past to potential buyers without any confidentiality provision or agreement.

     1.  Trade Secrets

Under Iowa law, a trade secret is defined as information that meets both of the following

criteria:

> a.  Derives independent economic value, actual or potential, from not being generally
> known to, and not being readily ascertainable by proper means by a person able to
> obtain economic value from its disclosure or use.
>
> b.  Is the subject of efforts that are reasonable under the circumstances to maintain its
> secrecy.

Iowa Code § 550.2(4).  The crux of the analysis in determining whether a particular piece of

information constitutes a trade secret is whether the information is or can be readily known.

Defendant argues that the information Plaintiff alleges constitutes trade secrets does not meet

---

Defendant's appendix as Exhibit 1.  Neither party provided the Court with a copy of the business plan
itself as part of the summary judgment record.

the definition of trade secrets articulated in Iowa Code § 550.2(4) because it is readily ascertainable by

proper means and because Plaintiff has not endeavored to keep the information secret.  Plaintiff

responds to Defendant's argument that Entertainment Tonite's financial records have not been kept

confidential by asserting that "[t]hrough the testimony of Michael Speer, Plaintiff in this case contends

that this financial information is maintained confidential by Plaintiff because knowledge of it would give

competitors a competitive advantage."  Plaintiff, however, has provided no citation to the summary

judgment record that would support this fact.  Mr. Speer's testimony at the temporary restraining order

hearing did indicate that, as of sometime in 2003, Entertainment Tonite began to keep its financial

information confidential.  By that point, however, Defendant Roemer had already left the business,

therefore he would no longer have been privy to any information being maintained in confidence that

might constitute trade secrets.  Mr. Speer's testimony also supported an inference that the accounting

firm utilized by Plaintiff would not release any financial information to nonmembers.  Defendant,

however, does not assert that the accountants failed to keep Daisy Dooks' financial information

confidential; rather, the allegation is that other *members* disclosed Daisy Dooks' financial information.

Mr. Speer admitted that other members have shown the financial records of Daisy Dooks and

Entertainment Tonite to individuals outside the business.

The Iowa Supreme Court has embraced an expansive understanding of the types of information

that can constitute "trade secrets." *See US West Communications, Inc. v. Office of Consumer

Advocate*, 498 N.W.2d 711, 714 (Iowa 1993) ("There is virtually no category of information that

cannot, as long as the information is protected from disclosure to the public, constitute a trade secret.").

The Court agrees with Plaintiff that the general categories of financial information disclosed by

Defendant could, if they met the requirements of Iowa Code § 550.2(4), constitute trade secrets. However, Plaintiff has failed to point the Court to any evidence that would indicate that the information Defendant disclosed was "not ascertainable by proper means by a person able to obtain economic value from its disclosure or use" and that such information "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." The undisputed facts demonstrate that a competitor could easily estimate approximately 95% of Daisy Dooks' revenue simply by coming to the club on a regular basis, counting the number of customers in attendance, and speaking with the dancers about their financial arrangements with Daisy Dooks. Additionally, Plaintiff has failed to demonstrate that it kept its financial information secret during the time Defendant was a member. To the contrary, there is undisputed evidence indicating that potential buyers, who could just as easily turn out to be potential competitors, were shown such information by Plaintiff's members without being required to pledge that they would in turn keep the information confidential.

For these reasons, summary judgment is granted to Defendant on Plaintiff's unauthorized use of trade secrets claim.

### 2. Breach of Fiduciary Duty/Breach of Common Law Duty of Loyalty

Defendant contends in his motion for summary judgment that he did not, as a matter of law, breach a fiduciary duty or common law duty of loyalty to Plaintiff for two primary reasons: 1) the position of trust giving rise to such a duty ends once an individual is no longer a director or officer of a corporation; and 2) the information Defendant disclosed in executing his plans to open a competing establishment did not qualify as "trade secrets," nor was it maintained in a confidential manner by Plaintiff. In resistance, Plaintiff argues that there is a common law duty in Iowa to maintain the secrecy

of trade secrets and confidential business information of a former employer as well as a current

employer.  Extrapolating, Plaintiff argues that Defendant's duty to Plaintiff as a managing member was

even stronger than the duty that an employee would have had to the business, therefore Defendant's

inclusion of Daisy Dooks' financial information in his business plan to solicit investors constituted a

breach of that duty.

The Iowa Supreme Court's analysis in *Midwest Janitorial Supply Corp. v. Greenwood*, 629

N.W.2d 371 (Iowa 2001), is instructive in this case.  In *Midwest Janitorial*, the defendant, a former

shareowner and director of the plaintiff corporation, began preparations to open a competing business

during the three weeks prior to resigning his position with the plaintiff.  These preparations included

contacting a realtor to seek availability of a warehouse, investigating the pricing of telephone systems,

investigating the acquisition of computer hardware and software, seeking a line of credit from a bank,

and arranging for signs for the new business.  One day after resigning, the defendant executed a lease

for an office and warehouse, and three days after resigning the defendant's new business was open.

On the day the new business opened, one of the plaintiff's most productive salespersons left to begin

working for defendant's new business.  Subsequently, another of the plaintiff's salespersons came to

work for the defendant as well. *Id.* at 373-74.

While recognizing that corporate directors and officers have a fiduciary duty to act "in all things

wholly for the benefit of the corporation," the *Midwest Janitorial* court decided that preparing to form

a competing business organization while still an officer or director of a corporation was not actionable

as a breach of fiduciary duty "unless it is shown that something in the preparation to compete produced

a discreet [sic] harm to the former business beyond the eventual competition that results from the

preparation." *Id.* at 375-76.

Defendant in the instant action made his preparations to initiate a competing business after he had already resigned as a member of Entertainment Tonite. The record indicates that the soonest possible date at which Defendant began showing prospective investors his business plan was the summer of 2001. Although it is undisputed that Defendant used certain financial information from Daisy Dooks in his business plan, it is similarly undisputed that the information that he disclosed in his business plan was information that was either readily obtainable through other means or was of a type that had already been disclosed on other occasions to individuals outside the business without adopting any confidentiality agreement or provision.

While a fiduciary duty or duty of loyalty may extend beyond the end of an individual's involvement as a shareholder, to find a breach of that duty requires evidence of more than mere intent on the part of the former shareholder to compete, or even actual competition. *See Midwest Janitorial*, 629 N.W.2d at 375-76. Plaintiff points the Court to nothing that would indicate that Plaintiff suffered any harm from Defendant disclosing certain financial information from Daisy Dooks to potential investors. Although Defendant disclosed certain financial information to potential investors in his competing business that he obtained as a result of his tenure as a member of Entertainment Tonite, Plaintiff has not shown that the information was otherwise unavailable to potential competitors. Though there is evidence that in 2003 Plaintiff began attempting to keep its financial information confidential, the undisputed evidence demonstrates that prior to 2003 Daisy Dooks' financial information was shared with individuals outside the business without any assertion of confidentiality. If Plaintiff, during the time period at issue here, did not even require its current members to maintain the confidentiality of its

financial information, it would be problematic to conclude that former members had breached a

fiduciary or common law duty by disclosing that same information.  Such a conclusion would hold a

former member to a higher standard than a current member.

The case cited by Plaintiff in resistance to Defendant's motion on the breach of duty claims,

*Uncle B's Bakery, Inc. v. O'Rourke*, 920 F.Supp. 1405 (N.D. Iowa 1996), is easily distinguished.  In

that case, the court found that, for the purposes of ruling on a preliminary injunction motion, an

employer had a reasonable likelihood of success on a common law breach of fiduciary duty claim

where a former employee was aware that his former employer valued the secrecy and confidentiality of

certain business information. *Id.* at 1430.  The court found that Iowa law supported the proposition that

"disclosure of information the employer desires to keep confidential, and makes reasonable efforts to

maintain as confidential, even if the information is not technically 'trade secrets' under the statutory

definition, may be enjoined as a violation of the common-law fiduciary duty of a former employee to a

former employer." *Id.* (citation omitted).  There is a clear distinction, however, between the situation the

court was presented with in that case and the circumstances present in the instant case.  In *Uncle B's*

*Bakery*, the court found that the plaintiff had "carefully guarded its trade secrets and confidential

information" through measures including requiring all visitors to the plaintiff's plant to sign a

confidentiality agreement, extracting from all suppliers a very stringent confidentiality agreement, and

requiring all employees to sign a confidentiality agreement. *Id.* at 1415-16.  As previously discussed,

Plaintiff Entertainment Tonite has presented no evidence to indicate that it had any measures in place

from its inception until 2003 to preserve the confidentiality of its financial information.

For these reasons, summary judgment is granted to Defendant on Plaintiff's breach of fiduciary

duty and breach of common law duty of loyalty claims.

III.  ORDER

       For the reasons discussed, summary judgment is hereby **granted** to Defendant.

       IT IS SO ORDERED.

       Dated this ___15th___ day of April, 2004.

_____
ROBERT W. PRATT
U.S. DISTRICT JUDGE